# UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **Teresa Glitta, Plaintiff,** | ) | Case No: |
| | ) | Jury Trial Demanded |
| | ) | Judge: |
| | ) | Magistrate Judge: |
| v. | ) | |
| | ) | |
| **UNITED AIRLINES, INC., Defendant.,** | ) | |
| | ) | |
| | ) | |
| | ) | |

## COMPLAINT

Plaintiff, TERESA GLITTA ("Plaintiff"), by and through her attorney, CELINA R. GLITTA, for her Complaint against Defendant, UNITED AIRLINES, INC. ("United"), alleges as follows:

## NATURE OF THE ACTION

1. This is an action for legal and equitable relief arising from United Airlines, Inc.'s ("United") violations of the Age Discrimination in Employment Act (ADEA) and the Americans with Disabilities Act (ADA).

2. Plaintiff, a 27-year veteran of United nearing retirement with an impeccable record, has been subjected to a calculated campaign of retaliation, disability and age-based discrimination, interference with counsel, hostile work environment, and bad-faith discipline.

1

3. These actions were intended to coerce Plaintiff's separation from the company and deprive her of the seniority-based benefits earned over nearly three decades of loyal service.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

5. Venue is proper in the Eastern Division of the Northern District of Illinois under 28 U.S.C. § 1391(b) as United is headquartered in Chicago and the acts complained of occurred within this District.

## PARTIES

6. Plaintiff Teresa Glitta is a resident of Chicago, Illinois. At all relevant times, she was an "employee" of Defendant as defined by 29 U.S.C. § 623(a) and 42 U.S.C. § 12111(4).

7. Defendant United Airlines, Inc. is a Delaware corporation qualified to do business in Illinois (File No. 52199484), with its principal executive offices located at 233 S. Wacker Drive, Chicago, IL 60606. Defendant maintains a registered agent for service of process at Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, IL 62703.

## PROCEDURAL ANTECEDENTS

8. On or about **November 28, 2025**, Plaintiff filed EEOC Charge No. 440-2026-01710.

9. On **December 23, 2025,** the EEOC issued a Notice of Right to Sue (**Exhibit 1**).

2

10. On **January 17, 2026**, following escalating retaliation and specifically interference with counsel, Plaintiff filed a second Charge, No. 440-2026-03278 (**Exhibits 2 and 3**). These acts are reasonably related to the initial charge and part of a continuing pattern of misconduct.

## FACTUAL ALLEGATIONS

### I. Employment History and July 2025 Protected Activity

11. Plaintiff is currently a **Customer Care Agent** for United Airlines and has been employed by the company since October 19, 1998.

12. Throughout her twenty-seven (27) year tenure, Plaintiff has maintained an impeccable record of service and dedication to the company. However, she was frequently bypassed for management opportunities despite her extensive experience and seniority. On at least one occasion, Plaintiff was explicitly informed by management that she was being passed over because she appeared "unkempt"—a subjective and derogatory critique often directed at older female employees to justify a lack of professional progression based on ageist and gendered stereotypes.

13. Plaintiff suffers from Primary Biliary Cholangitis (PBC), a rare autoimmune disease. United management was at all times aware of this condition as Plaintiff had **approved FMLA leave on file** for this specific disability.

3

14. On **July 14, 2025**, Plaintiff engaged in **Protected Activity** by reporting her supervisor, Milo Mical, for time-keeping irregularities and disparate treatment regarding the public recognition of work anniversaries.

## II. The Zurich Pretext and Disproportionate Discipline

15. On or about **August 14, 2025**, Plaintiff was denied boarding on an available flight in Zurich by Edelweiss Air, a subsidiary of Swiss International Air Lines ("Swiss Air")—United's partner airline acting as an agent for United. The denial was based on a previously undisclosed "four-dog limit," despite the fact that Plaintiff's pet, a small Lhasa Apso, had been expressly confirmed for travel prior to departure by Susanne Fraefel, an Interline agent with Lufthansa Group (the parent company of Swiss Air). (**Exhibit 4**).

16. This flight was wide-open with many seats available.

17. Plaintiff's daughter and counsel requested a copy of the unlisted travel policy and the contact information for Defendant's legal department to clarify the parameters of such policies as the Swiss agents were unable to produce such a policy.

18. Upon her return from Europe in **September of 2025**, Supervisor Milo Mical—who is male, significantly younger than Plaintiff, and has less seniority at the company—conducted an adjudication meeting on or about **September 15, 2025**. Union Steward Jennifer Goco Juridico and note taker Edgar Espindola was present as a witness.

19. Mical refused to allow Plaintiff to explain the lack of a published policy and refused to consider that Plaintiff an older sick woman was stranded in Zurich on a holiday in Europe

unable to abandon her small dog at the airport nor have the dog a short nosed breed travel in cargo, instead screaming at Plaintiff and characterizing her emotional distress (crying) as "inappropriate" and "unacceptable behavior."

20. Mical told Plaintiff she was being punished because she had high expectations to get on the flight and silenced Plaintiff when she attempted to explain the flight was wide open and the pet confirmed prior to travel to Switzerland.

21. In a blatant attempt to intimidate Plaintiff, Supervisor Milo Mical also mischaracterized Plaintiff's counsel's routine professional inquiry about Swiss' policies as a 'threat to sue.' Mical then used this fabrication as a justification to further retaliate against Plaintiff, falsely claiming that third-party agents (Swiss Air) were 'reporting' her because of her counsel's inquiry. This mischaracterization was a bad-faith effort to chill Plaintiff's exercise of her right to counsel and to isolate her from legal protection.

22. In an attempt to further humiliate and marginalize Plaintiff, Supervisor Milo Mical targeted Plaintiff for communicating with her daughter in **Italian** while at the counter. When Plaintiff explained that Italian is the primary language she uses with her family, Mical baselessly suggested that a third-party agent may have been offended by the conversation. When Plaintiff logically pointed out that the agent in question—a Southeast Asian woman—did not speak or understand Italian, Mical seized upon the comment to perform a 'bad-faith' reversal. He began screaming, **'What does that mean?'** in a calculated effort to falsely paint Plaintiff as biased, effectively weaponizing her cultural identity and her factual observation against her to create a hostile work environment.

23. Plaintiff's dedication to the company was also met with open hostility from management. During the adjudication meeting in **September of 2026** just one month shy of her 27th anniversary, Plaintiff referenced her nearly twenty-seven (27) years of service during a discussion with Supervisor **Milo Mical**. In a calculated attempt to diminish her professional standing and tenure, Mical dismissively corrected her, stating, '**You mean 26 years.**' This petty and unnecessary correction was part of a larger pattern intended to marginalize Plaintiff and remind her that her decades of loyalty were of no value to current management.

24. In this meeting and throughout 2025 and 2026, Supervisor Milo Mical engaged in a pattern of aggressive verbal castigation directed at Plaintiff. Mical targeted Plaintiff with demeaning outbursts in the presence of her colleagues, increasing her workload by sending large amounts of 'aging cases' to try to set her up for failure despite being on notice that Plaintiff is older and suffered from **Primary Biliary Cholangitis (PBC)**—a condition exacerbated by high-stress environments—Mical intentionally used these public confrontations to intimidate Plaintiff, showing a **callous disregard for her medical stability and her 27-year tenure** with the company.

25. Without any evidence, and failing to conduct an interview with Plaintiff's daughter (a direct witness), Mical summarily imposed a draconian six-month travel ban—a disciplinary measure Plaintiff had never been subjected to in her twenty-seven (27) years of employment and frequent travels with United. Following the imposition of the ban, Mical engaged in a calculated pattern of taunting by frequently and loudly boasting of his own upcoming international travel in Plaintiff's immediate presence, knowing she was

now grounded, for the sole purpose of demeaning her and further aggravating her medical condition.

26. Union Steward **Dena Peña** expressed "shock" at the severity of the punishment, noting that in her experience at United, such bans are typically reserved for employees involved in **physical altercations** on United aircrafts and strictly on United flights not verbal disagreements with partner airlines or the questioning of policies.

27. In a standard workplace environment, a twenty-seven (27) year employee with an unblemished record involved in a policy disagreement would, at most, receive a warning or a directive to 'get along' with management. Instead, United bypassed all levels of progressive discipline to treat Plaintiff as a significant threat, imposing a punishment that was objectively disproportionate to the alleged conduct.

28. Despite being put on notice of these irregularities, United's corporate leadership chose to ratify the retaliation. On **October 6, 2025**, **Megan Detzner**, Director of Compliance, issued a formal response stating the company was 'confident' that the disciplinary actions were appropriate (**Exhibit 5**). By failing to address the lack of evidence, the targeted workload increases, or the failure to interview key witnesses, Detzner effectively sanctioned the ongoing harassment of a 27-year employee."

29. Furthermore, United's imposition of a travel ban is not merely the revocation of a 'privilege,' but the deprivation of a **seniority-based benefit**. At United, flight benefits are strictly allocated and boarded based on an employee's **years of service**; by stripping

7

Plaintiff of these benefits, United effectively devalued her twenty-seven (27) years of earned seniority and professional standing.

### III. The January 2026 Interference and Pretextual Bypass of Counsel

30. Defendant was on notice of Plaintiff's legal representation as early as **September 2025**. In fact, when Union Stewards previously attempted to intervene regarding the Zurich travel ban, Defendant's management including Milo Mical refused to engage, explicitly stating they could not discuss the matter because Plaintiff was represented by counsel.

31. Despite this established boundary, shortly before Plaintiff's birthday on **January 15, 2026**—well after the EEOC charge had been filed and the Right to Sue had been issued—Senior Investigator **Jay Smith** contacted Plaintiff directly to initiate an 'internal investigation' into the very facts of her pending litigation (**Exhibit 6**). This direct contact was a bad-faith circumvention of the attorney-client relationship and a blatant disregard for the protections afforded under **Model Rule of Professional Conduct 4.2**, intended to pressure a represented party into making statements against her own legal interests by **deliberately bypassing her attorney of record**.

32. Despite clear notice of representation, Smith explicitly refused to allow Plaintiff's attorney to be present or even be copied on correspondence, stating: ***"Please be advised that this matter is being reviewed as an internal company investigation. As such, I am unable to correspond directly with an attorney or conduct investigative interviews with third-party legal representation present."*** (**Exhibit 6**).

33. In a blatant attempt to isolate Plaintiff from her legal advocate, Mr. Smith further instructed Plaintiff not to inform anyone about the meeting: *"As a reminder, investigations are confidential. Please do not share information with others prior to or after our meeting."* (**Exhibit 6**).

34. To further intimidate and coerce Plaintiff, Mr. Smith issued a direct ultimatum: if Plaintiff refused to participate in the "investigation" without her legal counsel present, United would simply "make findings" based on one-sided evidence. Smith stated: *"If you elect not to participate, Corporate Security will proceed with the investigation and make findings based on the information and evidence currently available."* (**Exhibit 6**). This statement was a transparent attempt to force a disabled employee into a predatory, unrepresented interview by threatening her with an adverse disciplinary record if she exercised her right to counsel.

35. United, acting through its agents and investigators—including **Jay Smith**—engaged in a **bad-faith circumvention of the attorney-client relationship**. This conduct was a direct violation of the protections afforded to represented parties under the **Model Rules of Professional Conduct**, specifically intended to pressure Plaintiff into making statements against her own legal interests while intentionally bypassing her attorney of record.

36. Later in the day on **January 15, 2026**, Associate General Counsel Sheila Frederick issued a formal response ratifying the bypass of Plaintiff's counsel. (**Exhibit 7**). In a transparent attempt to recharacterize a high-stakes investigation into pending federal litigation, Frederick claimed that Senior Investigator Jay Smith's outreach was merely "employee to employee."

37. Frederick explicitly dismissed Plaintiff's invocation of her right to counsel, stating that there is *"nothing preventing United personnel from interacting with its own employee,"* despite United's prior refusal to speak with Union Stewards on the basis that Plaintiff was represented.

38. In a transparent attempt at **damage control** after bypassing Plaintiff's counsel, Sheila Frederick issued a final ultimatum, stating: *'If your client does not wish to participate in the internal investigation, that is perfectly fine. The investigator will not reach out to her again.'* (**Exhibit 7**). This statement was not a neutral offer of choice, but a calculated threat intended to coerce Plaintiff into waiving her right to a fair investigation without the protection of her attorney, in further violation of the spirit of **Model Rule 4.2**.

39. Combined with Mr. Smith's prior threat that United would **"*proceed with the investigation and make findings"*** based on one-sided evidence if Plaintiff did not submit to an unrepresented interview, Frederick's letter confirmed a coordinated corporate strategy to:

- **Coerce** a disabled employee into waiving her right to counsel;
- **Interfere** with Plaintiff's exercise of protected rights under the ADA; and
- **Isolate** a 27-year veteran from her legal advocate during her 60th birthday month

## IV. The February 2026 "Core 4" Weaponization

40. In February 2026, a younger coworker rudely dismissed Plaintiff's professional inquiries calling her "lady."

41. Plaintiff invoked United's **"Core 4"** motto to address the hostility.

42. One day after this exchange, Supervisor Mical used this incident to target Plaintiff and retaliated by "flipping" the policy; he ignored the younger co-worker's behavior and instead targeted Plaintiff who was on the receiving end, giving a lecture about kindness and Core 4 and demanding a hyper-specific "timeline" of the interaction from Plaintiff to manufacture a disciplinary file.

## COUNT I: RETALIATION (ADEA)

43. Plaintiff incorporates by reference all preceding paragraphs.

44. Defendant took materially adverse actions against Plaintiff—specifically the removal of seniority-based benefits, humiliation in front of coworkers, refusal to acknowledge anniversaries, increasing her workload, and the intentional interference with counsel—to punish Plaintiff for her protected EEO activity.

45. These actions were taken as Plaintiff approached her planned retirement and were intended to coerce her separation from the company.

46. Younger, similarly situated employees who did not engage in protected activity were not subjected to such draconian and disproportionate disciplinary measures.

47. These actions would dissuade a reasonable worker from making a charge of discrimination.

## COUNT II: RETALIATION & INTERFERENCE (ADA § 503(b))

11

48. Plaintiff incorporates by reference all preceding paragraphs.

49. Defendant's insistence on a "direct-contact" investigation—while explicitly refusing in writing to recognize or communicate with Plaintiff's designated legal counsel and **threatening that adverse findings would be made** without her participation—constitutes unlawful interference, coercion, and intimidation in violation of 42 U.S.C. § 12203(b).

50. Defendant further interfered with and intimidated Plaintiff by intentionally and disproportionately increasing her workload through the assignment of 'aging cases' that were known to be more difficult and time-consuming. This assignment was not a neutral business decision but a **calculated setup for failure**, deployed against a 27-year veteran employee with a known medical condition (PBC) for the purpose of creating a pretextual record of poor performance in retaliation for her protected complaints.

51. These actions, **ratified by Defendant's Legal Department**, were a pretextual attempt to deprive a medically vulnerable employee of her legal protections and to coerce her into participating in a sham disciplinary process without the benefit of advocacy.

52. Defendant's conduct was specifically intended to **chill** Plaintiff's exercise of her protected rights under the ADA and to exacerbate the stress-related symptoms of her underlying disability (PBC).

53. As a direct and proximate result of this interference, Plaintiff has suffered significant emotional distress and a further deterioration of her health.

**COUNT III: HOSTILE WORK ENVIRONMENT**

54. Plaintiff incorporates by reference all preceding paragraphs.

55. Since July 2025, Plaintiff has been subjected to a **severe and pervasive pattern of workplace abuse** that was both subjectively and objectively offensive.

56. This harassment was specifically targeted at Plaintiff's age and disability, including:

- **Public Shaming and Verbal Abuse:** Screaming by Supervisor Milo Mical in the presence of witnesses, intended to humiliate a senior, medically vulnerable employee.

- **Disparate Recognition:** Mical's systematic refusal to acknowledge Plaintiff's significant work anniversaries while publicly celebrating those of younger employees—a practice he only "corrected" in bad faith after contact from Plaintiff's counsel.

- **Targeted Retaliation:** Mical's attempts to "attack" and discipline Plaintiff by proxy for the "Core 4 incident," despite Plaintiff's lack of involvement, as a pretext to "paper" her file.

- **Workload Manipulation and Targeted Failure:** Mical's disproportionate assignment of "aging cases"—files known to be the most complex and time-consuming—specifically to Plaintiff. This was not a neutral business practice but a calculated attempt to overwhelm a veteran employee with a known medical condition (PBC) and create a hostile, high-stress environment designed to induce a performance failure.

- **Medical Endangerment:** The bad-faith weaponization of "Core 4" values to justify stripping a sick employee of her seniority-based travel benefits right before her 60th birthday knowing she goes abroad frequently to her family home as she has no family in the United States.

57. This conduct altered the conditions of Plaintiff's employment, created an abusive working environment, and caused Plaintiff significant physical and emotional distress.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, **Teresa Glitta**, respectfully requests that this Court enter judgment in her favor and against Defendant, **United Airlines, Inc.**, for the following relief:

1. **Declaratory Relief:** A declaration that Defendant's actions—including the imposition of a **seniority-based travel ban** without evidence and the **intentional bypass of legal counsel**—constituted unlawful retaliation and discrimination in violation of the ADEA and ADA.

2. **Injunctive Relief:** A permanent injunction enjoining Defendant, its officers, and agents—specifically including **Supervisor Milo Mical**—from further acts of retaliation or interference with Plaintiff's protected rights.

3. **Restoration of Seniority Benefits and Record:** An order requiring the immediate and permanent restoration of Plaintiff's **seniority-based flight benefits** and the complete **expungement** of all disciplinary records related to the Zurich boarding incident of **August 2025**.

4. **Compensatory Damages:** An award of compensatory damages for emotional distress, professional humiliation, and financial loss, including out-of-pocket costs resulting from the Zurich boarding denial and subsequent "draconian" travel ban, **in an amount to be determined at trial.**

5. **Punitive Damages:** An award of punitive damages for United's willful, malicious, and bad-faith disregard of Plaintiff's federally protected rights, as evidenced by the interference with

counsel in violation of the spirit of Model Rule 4.2, **in an amount to be determined at trial.**

6. **Attorneys' Fees and Costs:** An award of reasonable **attorneys' fees** and all costs associated with this action.

7. **Other Relief:** Such further relief as this Court deems just and proper.

**JURY DEMAND** Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

**Celina R. Glitta**
ARDC#6332728
Celina.Glitta@jamesandjameslegal.com
Office address: 3400 W. Stonegate Blvd.
Arlington Heights, IL 60005
*Attorney for Plaintiff Teresa Glitta*